**BURSOR & FISHER, P.A.**
Neal J. Deckant (State Bar No. 322946)
Ines Diaz Villafana (State Bar No. 354099)
Joshua B. Glatt (State Bar No. 354064)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone:  (925) 300-4455
Facsimile:  (925) 407-2700
Email:  ndeckant@bursor.com
        idiaz@bursor.com
        jglatt@bursor.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JONATHAN KROSKEY, individually and on behalf of all others similarly situated,<br><br>                    Plaintiff,<br><br>    v.<br><br>ELEVATE LABS, LLC and MINDSNACKS, INC.<br><br>                    Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br><u>**JURY TRIAL DEMANDED**</u> |

Plaintiff Jonathan Kroskey ("Plaintiff"), by and through his attorneys, brings this action on behalf of himself and all others similarly situated. Plaintiff makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to allegations specifically pertaining to himself and his counsel, which are based on personal knowledge.

## NATURE OF THE ACTION

1.      This is a class action suit brought against Defendants Elevate Labs, LLC ("Elevate") and MindSnacks, Inc., ("MindSnacks") (Collectively, "Defendants" or "Balance") for violating the Video Privacy Protection Act ("VPPA"), California Civil Code § 1799.3, and the California Information Privacy Act, Cal. Pen. Code § 631 ("CIPA").

2.      Defendants own and operate a mobile meditation application called Balance: Meditation & Sleep ("Balance" or the "App"). The App is available on both Android[1] and iOS[2] mobile devices. As used herein, the "App" shall refer to both the Android and iOS versions, unless otherwise specified.

3.      Defendants advertise their App as a meditation tool that "adapts to you" and helps users "[i]mprove [their] sleep, stress, and more."[3] Defendants provide users with pre-recorded meditation videos via its App.

4.      Unbeknownst to Plaintiff and Class Members, Defendants knowingly and intentionally disclose their users' personally identifiable information, including a record of every video the user views on the App and their email address, to an unrelated third party: Braze, Inc. ("Braze"). Defendants further enable Braze to intercept App users' communications with Defendants when users answer health and wellness questions presented to them during Defendants' onboarding survey in the App.

5.      The United States Congress passed the VPPA in 1988, seeking to confer onto consumers the power to "maintain control over personal information divulged and generated in

---

[1] https://play.google.com/store/apps/details?id=com.elevatelabs.geonosis&pli=1

[2] https://apps.apple.com/us/app/balance-meditation-sleep/id1361356590

[3] BALANCE, https://balanceapp.com/.

exchange for receiving services from video tape service providers." S. Rep. No. 100-599, at 8 (1988). "The Act reflects the central principle of the Privacy Act of 1974: that information collected for one purpose may not be used for a different purpose without the individual's consent." *Id.*

6.      With a similar focus on protecting individual privacy, CIPA § 631(a) prohibits a party from aiding, agreeing with, and/or employing a third party to eavesdrop on communications between parties without the consent of all parties to the communication. And CIPA § 632(a) prohibits any person from "us[ing] an electronic amplifying or recording device to eavesdrop upon or record" confidential communications.

7.      Defendants' actions violated the VPPA, Cal. Civ. Code § 1799.3, and CIPA § 631(a). Accordingly, Plaintiff brings this action for damages and other legal and equitable remedies resulting from Defendants' violations of these statutes.

## THE PARTIES

*Plaintiff*

8.      Plaintiff Jonathan Kroskey is a citizen of California who resides in San Jose, California.

9.      Plaintiff Kroskey subscribed to Defendants' paid membership of the Balance meditation App in July 2023. He created his account using an email address which contains his real first and last name. When Plaintiff Kroskey subscribed to Balance, he answered Defendants' onboarding survey (the "Survey"), thereby communicating to Defendants details about his past experience with meditation, what personal issues he wanted to address with meditation, and his preferences for doing meditation. Plaintiff Kroskey then used this Balance membership to view the pre-recorded meditation videos Defendants offer on the App. Plaintiff Kroskey frequently visited the Balance App to view meditation videos during his subscription period.

10.     Unbeknownst to Plaintiff Kroskey, Defendants installed Braze's software on its App, thereby enabling Braze to intercept his answers to the Survey while these communications were in transit. Defendants did not procure Plaintiff's consent to engage in aiding Braze's interception of Plaintiff's communications. Further, each time Plaintiff Kroskey watched a

1    meditation video, Defendants also disclosed the name of the video Plaintiff watched, along with his

2    email address and full name to Braze.  Defendants did not obtain Plaintiff Kroskey's consent to

3    disclose his video viewing history, email address, and full name to Braze.  Plaintiff did not

4    discover and could not have discovered this violation until November 2024 upon his retention of

5    counsel.

6    ***Defendants***

7            11.     Defendant Elevate Labs, LLC, is a Delaware limited liability company with its

8    principal place of business in San Francisco, California.  Elevate Labs, LLC is an affiliate of

9    MindSnacks, Inc.

10          12.     Defendant MindSnacks, Inc., is a Delaware corporation with its principal place of

11   business in San Francisco, California.

12          13.     Together, Elevate Labs, LLC and MindSnacks, Inc. jointly operate, control,

13   program, and run the Balance App.  As such, Defendants jointly derive a benefit from the App.

14                            **JURISDICTION AND VENUE**

15          14.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

16   § 1331 because it arises under a law of the United States (the VPPA).  This Court also has

17   supplemental jurisdiction over the California state law claims because they arise from the same

18   transactions and occurrences which gave rise to the action under federal law.  This Court further

19   has jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2), because

20   the amount in controversy exceeds $5,000,000.00, exclusive of interest and costs, there are more

21   than 100 members of the Class and California Subclass, and there is minimal diversity.

22          15.     This court has general personal jurisdiction over Defendants because Defendants'

23   principal place of business is in this District.

24          16.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendants

25   reside in this District.

26

27

28

# FACTUAL ALLEGATIONS

## A.    History And Overview Of The VPPA

17.    The origins of the VPPA began with President Ronald Reagan's nomination of Judge Robert Bork to the United States Supreme Court.  During the confirmation process, a movie rental store disclosed the nominee's rental history to the Washington City Paper which then published that record.  With an eye toward the digital future, Congress responded by passing the VPPA.  As Senator Patrick Leahy, who introduced the Act, explained:

> It is nobody's business what Oliver North or Robert Bork or Griffin Bell or Pat Leahy watch on television or read or think about when they are home.  In an area of interactive television cables, the growth of computer checking and check-out counters, of security systems and telephones, all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch, who are some of the people they telephone.  I think that is wrong.

S. Rep. 100-599, at 5-6 (internal ellipses and brackets omitted).

18.    Accordingly, the VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider."  18 U.S.C. § 2710(b)(1).  The VPPA defines personally identifiable information ("PII") as "information which identifies a person as having requested or obtained specific video materials or services from a video service provider."  18 U.S.C. § 2710(a)(3).  A video tape service provider is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials."  18 U.S.C. § 2710(a)(4).

19.    Individuals who are "aggrieved" by a violation of the VPPA may bring an action for "not less than liquidated damages" of $2,500 per violation, in addition to other remedies.  18 U.S.C. §§ 2710(c)(1)-(2).

## B.    Overview Of California Civil Code § 1799.3

20.    Along a similar vein, the California Legislature enacted Cal. Civ. Code § 1799.3 which prohibits a "person providing video recording sales or rental services" from disclosing "any

personal information or the contents of any record, including sales or rental information, which is prepared or maintained by that person, to any person, other than the individual who is the subject of the record, without the written consent of that individual."

21.    Cal. Civ. Code § 1799.3 provides a wider breadth of protection compared to the VPPA because it does not require that the information disclosed by video recording sales or rental service providers be *identifiable* to any one particular person.  Instead, the statute forbids the disclosure of generalized "personal information" without that person's consent, even if that information does not serve to identify them.  The statute also forbids the disclosure of "the contents of any record, including sales or rental information," such as the mere title of the video a subscriber watches.  We know the statute independently forbids the "contents of any record," from being disclosed without consent because the phrase is preceded by the word, "or" – not "and."  Under California law, "the plain and ordinary meaning of the word 'or,' when used in a statute, is to designate separate, disjunctive categories.  The word 'or' suggests alternatives.  In its ordinary sense in a statute, the function of the word 'or' is to mark an alternative such as 'either this or that.'"  *In re E.A.*, 24 Cal. App. 5th 648, 661 (2018) (citations omitted) (internal quotation marks omitted).

22.    Under Cal. Civ. Code § 1799.3(c), Plaintiff and Class Members may seek injunctive statutory damages of $500 per violation.

**C.    History And Overview Of The CIPA**

23.    The California Legislature enacted the Invasion of Privacy Act to protect certain privacy rights of California citizens.  The legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society."  Cal. Penal Code § 630.

24.    The CIPA, Cal. Penal Code § 630, *et seq.*, prohibits aiding or permitting another person to willfully – and without the consent of all parties to a communication – read or learn the contents or meaning of any message, report, or communication while the same is in transit or

passing over any wire, line, or cable, or is being sent from or received at any place within California.

25.     To establish liability under Cal. Penal Code § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,

Or

Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,

Or

Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,

Or

Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

26.     Section 631(a)'s applicability is not limited to phone lines, but also applies to "new technologies" such as computers, the internet, and email. *See Matera v. Google Inc*., 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *Bradley v. Google, Inc*., 2006 WL 3798134, at *5-6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020) (reversing dismissal of CIPA and common law privacy claims based on Facebook's collection of consumers' internet browsing history).

27.    Under Cal. Penal Code § 637.2, Plaintiff and Class Members may seek injunctive relief and statutory damages of $5,000 per violation.

**D.    Overview Of The Braze Service**

28.    Defendants knowingly disclose information to third party, Braze, sufficient to identify specific Class Members, view and learn their private communications, and learn the specific videos they watched.

29.    Defendants' disclosures of this information, and Braze's interception of Plaintiff and Class Members' communications with Defendants are possible because Defendants chose to incorporate the Braze "software development kit" ("SDK") and "application programming interface" ("API") into its App (the "Braze Service").

30.    Braze describes its Service as a "customer engagement platform"[4] for marketers to "[d]eeply understand [their] customers and learn about their evolving preferences and behaviors, all in real time.[5]

31.    Once integrated into a mobile application, such as Defendants' App, the Braze Service allows app owners to, among other features, analyze app data in real time, conduct real-time targeted marketing campaigns,[6] and send personalized push notifications and in-app messages to mobile users.[7]  The Braze service further helps app owners "[g]ain deeper engagement insights" by providing things like "[p]redictive customer insights" that help App owners "[i]dentify, target and engage customers based on their likelihood to purchase or perform" and to providing "audience segmentation" which builds audience segments.[8]

32.    The data Braze collects is not just from one source.  On the contrary, app developers like Defendants can integrate customer information from a variety of sources into Braze.  Using

---

[4] ABOUT BRAZE, BRAZE, https://www.braze.com/product/overview.

[5] *Id.*

[6] DATA & ANALYTICS, BRAZE, https://www.braze.com/product/data-and-analytics.

[7] MOBILE & WEB PUSH, BRAZE, https://www.braze.com/product/mobile-web-push; In-App & In-Browser Messaging, BRAZE, https://www.braze.com/product/in-app-in-browser-messages.

[8] Reporting and Analytics, BRAZE, https://www.braze.com/product/reporting-analytics.

---

this information, app developers can then utilize Braze's analytics to obtain a "unified view" of their customers in order to "act on real-time and historical preferences, behaviors, conversion likelihood, and interactions across channels" to target them more effectively.[9]

33.    Braze conglomerates all of this data into user profiles, which it associates with identifiers like a Braze user ID and/or e-mail address.[10]

34.    As Braze collects more information however, the user profiles become even more detailed.  These detailed user profiles could include information related to a user's location, gender, age group, operating system, past purchases, and actions taken on a website.[11]

35.    Notably, all of this information is not disclosed to Braze by default.  Instead, Braze only receives information such as users' time zone and browser type by default.[12]  Rather, app developers like Defendants must *specifically choose* to disclose additional information such as e-mail addresses to Braze.[13]

36.    Defendants utilize the Braze Service on its Balance App.  Thus, Defendants utilize the Braze Service to analyze user data, create and analyze the performance of marketing campaigns, and target specific users or specific groups of users for advertisements.  All of this helps Defendants further monetize the App and maximize revenue by collecting and disclosing as much PII as possible to Braze through the Braze Service.

37.    When a user accesses a mobile application hosting the Braze service, Braze surreptitiously directs the user's browser to simultaneously send a separate message to Braze's servers.  This second, secret transmission contains the data that Braze collects on users' interactions with the mobile application.  This transmission is initiated by the Braze Service and

---

[9] *Id.*

[10] USER PROFILES, BRAZE, https://www.braze.com/docs/user_guide/engagement_ tools/segments/user_profiles/#access-profiles.

[11] *See id.*

[12] SDK DATA COLLECTION, BRAZE, https://www.braze.com/docs/user_guide/data_ and_analytics/user_data_collection/sdk_data_collection/?redirected=true#personalized-integration.

[13] *Id.* ("Personalized Integration; Braze gives you the flexibility to collect data in addition to the default optional data.").

concurrent with the communications with the host mobile application.  In other words, Braze's

interceptions of communications via mobile applications occur while the communications are in

transit.

**E.      Defendants Are Video Tape Service Providers**

38.     Defendants own and operate the Balance App.  The App provides subscribers with a

library of pre-recorded meditation videos.  The level of visual interactivity of each video varies.

All videos in the library include a visual component—at a minimum, they include three, blue-

colored, lines that run across the screen horizontally and move like soft waves.

39.     To access the videos, consumers must create an account.  Defendants provide a free

subscription with limited access to videos, and an annual subscription that enables subscribers with

access to the full library of videos.  Defendants charge consumers $69.99 for the annual

subscription to receive full access to the library of videos.[14]

40.     Therefore, Defendants sell or rent access to their library of pre-recorded meditation

videos to their consumers and deliver their pre-recorded videos to consumers via the App, making

them video tape service providers under the VPPA.

**F.      Defendants Disclose App Users' E-Mail Addresses And Video
Viewing Histories To Braze**

41.     Prior to the commencement of this action, Plaintiff's counsel conducted a dynamic

analysis of the App.  A "dynamic analysis" records the transmissions that occur from a user's

device.

42.     This analysis tested what information (if any) Defendants disclosed to third parties

when consumers use the App.

43.     The analysis revealed that when Balance subscribers utilize the App and watch

meditation videos, Defendants disclose the consumer's email address, full name, and the name of

the video they are viewing with Braze.  The following images show the data transmissions from

Defendants to Braze.  Defendants disclosed Plaintiff and Class Members' email addresses, full

name, and video viewing histories in the same way as illustrated below.

---

[14] Balance, https://get.balanceapp.com/account/subscription/new.

44.     For example, when a user views the meditation video titled "Sleep" on the App, Defendants disclose to Braze the "exercise id."  The "exercise id" is the name of the video the consumer is watching (in the following example, that is "Sleep").  *See* Figures 1-2.  Further, in the example below, Defendants also disclosed the user's full name, Ines Diaz, along with the user's email address, idiaz@bursor.com.  *See* Figure 2.

**<u>Figure 1</u>**



**Figure 2**

```
            "progress_skill_progress_for_next_level_breath-concentration": 1500,
            "progress_time_trained_minutes": 146
        },
        "email": "idiaz@bursor.com",
        "first_name": "Ines Diaz",
        "last_name": "lastname_placeholder",
        "user_id": "7042847"
    }],
    "device_id": "B6DA5974-B54B-4C0D-AE75-A25C48423D57",
    "events": [{
        "data": {
            "n": "ExerciseAudioCompleted",
            "p": {
                "exercise_audio_time_in_seconds": 3311,
                "exercise_duration_in_minutes": 60,
                "exercise_id": "sleep",
                "exercise_uuid": "e7629f16-d52a-4585-1adc-a0daf68e84fd",
                "exercise_voice_id": "male",
                "single_id": "sleep"
```

45.    Figure 3 shows a second example of Defendants disclosing the same information to Braze when a user watches the video titled "energize." *See* Figure 3.

**Figure 3**

```
            "progress_single_completed_energize": 2,
            "progress_skill_current_progress_breathwork": 360,
            "progress_time_trained_minutes": 26
        },
        "email": "idiaz@bursor.com",
        "first_name": "Ines Diaz",
        "last_name": "lastname_placeholder",
        "user_id": "7042847"
    }],
    "device_id": "B6DA5974-B54B-4C0D-AE75-A25C48423D57",
    "events": [{
        "data": {
            "n": "ExerciseAudioCompleted",
            "p": {
                "exercise_audio_time_in_seconds": 231,
                "exercise_duration_in_minutes": 3,
                "exercise_id": "energize",
                "exercise_uuid": "9b7b5606-7ace-47d5-ebda-6524091848f5",
                "exercise_voice_id": "male",
                "single_id": "energize"
            }
```

46.     A consumer's full name is PII because it can be used to identify a person.  Similarly, an email address is PII because it is a unique string of characters that designates an electronic mailbox.  As industry leaders,[15] trade groups,[16] and courts agree,[17] an ordinary person can use an email address to uniquely identify another individual.  Indeed, there are multiple services that enable anyone with internet access and a credit card to look up who owns a particular e-mail address.[18]

47.     Thus, Defendants disclose to Braze information sufficient to enable an ordinary person to identify the specific App user who is watching a pre-recorded video.

48.     At no point do Defendants provide users with an opportunity to give or deny consent to Defendants' disclosure of users' name, email, and video viewing histories to Braze.

### G.     Defendants Aid, Agrees With, And Employ Braze's Interception Of App Users' Confidential Communications

49.     When creating an account, which is mandatory to watch videos or access Defendants' meditation service, users are required to answer Defendants' onboarding Survey.  The Survey involves answering a series of questions to personalize the program to the needs of each user.

50.     The dynamic analysis revealed that when users answer the onboarding Survey on the App, Defendants employ or otherwise enable Braze to intercept in-transit (*i.e.*, contemporaneously with an App user entering the information), users' communications with the App.

---

[15] Allison Schiff, *Can Email Be The Next Big Online Identifier?*, AD EXCHANGER (Aug. 25, 2020), https://www.adexchanger.com/data-exchanges/can-email-be-the-next-big-online-identifier/ (quoting Tom Kershaw, CTO of Magnite, who said "[a]n email address is universally considered to be PII, so as such it can never be a valid identifier for online advertising").

[16] NETWORK ADVERTISING INITIATIVE, NAI CODE OF CONDUCT 19 (2019), https://thenai.org/wp-content/uploads/2021/07/nai_code2020.pdf (identifying email as PII).

[17] *See, e.g.*, *United States v. Hastie*, 854 F.3d 1298, 1303 (11th Cir. 2017) ("Email addresses fall within the ordinary meaning of information that identifies an individual.  They can prove or establish the identity of an individual.").

[18] *See, e.g.*, www.beenverified.com.

51.     The types of questions Defendants ask in the onboarding Survey are sensitive questions related to why a user is seeking meditation.  Defendants ask users a different set of follow-up questions based on their answer to the first question of the Survey.

**Figure 4**



52.    For example, the first question Defendants ask users is to "[s]elect the goals that matter" to the user.  *See* Figure 4.  If the user chooses the answer "Reduce Stress," Defendants will provide a series of questions specific to the user's stress.  Similarly, if a user selects one of the other options, the subsequent questions will be based on the user's first answer choice.

53.    The answers to the questions a user provides are intercepted in transit by Braze as shown in the examples below.

54.    When a user choses "Reduce Stress" as the answer to the first, question, Braze intercepts this communication as shown in Figure 5 below.

**Figure 5**

```
    "data": {
        "n": "OnboardingGoalSelectionAnswered",
        "p": {
            "focus_selected": false,
            "mood_selected": false,
            "sleep_selected": false,
            "stress_selected": true
        }
    },
    "name": "ce",
    "session_id": "ACE1D7A1-106A-4109-B690-7EA81B115367",
    "time": 1729934752.581,
    "user_id": "7018096"
}, {
    "data": {
        "n": "OnboardingGoalSelectionCompleted",
        "p": {
            "stress": "yes"
```

55.    Based on choosing "Reduce Stress" as the answer to the first, question, Defendants then proceed to ask users more stress related questions.  For example, Defendants ask users to answer how often they feel stressed.  *See* Figure 6.

1

**Figure 6**

2



3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20      56.    When a user answers the question, Braze intercepts that communication.  For

21  example, if a user says they feel stressed "Sometimes," Braze will intercept that answer.  *See*

22  Figure 7.

23

24

25                                      [Space Intentionally Left Blank]

26

27

28

**Figure 7**

```
    "api_key": "da46dd12-f328-44a6-90c4-7f0ab785ef73",
    "app_version": "1.148.0",
    "app_version_code": "1.148.0.0",
    "device_id": "B6DA5974-B54B-4C0D-AE75-A25C48423D57",
    "events": [{
        "data": {
            "n": "OnboardingStressQuestion1Answered",
            "p": {
                "answer_id": "sometimes",
                "question_id": "how_often_feel_stress"
            }
```

57.    Defendants then ask users "[h]ow often do [they] experience stress?" *See* Figure 8.

When a user answers this question, Braze will also intercept that communication. *See* Figure 9.

**Figure 8**



**Figure 9**

```
}, {
    "data": {
        "n": "OnboardingStressQuestion2Answered",
        "p": {
            "answer_id": "moodiness",
            "question_id": "how_experience_stress"
        }
    }
}
```

58.     Defendants then ask users to answer what their biggest source of stress is.  *See* Figure 10.  Just like with the previous questions, when a user states their biggest source of stress, for example, "relationships," Braze intercepts that communication.  *See* Figure 11.

**Figure 10**



**Figure 11**

```
    },
    "name": "ce",
    "session_id": "ACE1D7A1-106A-4109-B690-7EA81B115367",
    "time": 1729934755.374,
    "user_id": "7018096"
}, {
    "data": {
        "n": "OnboardingStressQuestion3Answered",
        "p": {
            "answer_id": "family_relationships",
            "question_id": "source_of_stress"
```

59.     As incorporated into the App, the Braze Service does not operate merely as a tape recorder or "tool" used by one party to record the other.  Instead, Braze is a separate and distinct third-party entity from the parties to the conversation (*i.e.,* the User and the Balance App) and therefore eavesdrops upon, records, extracts data from, and analyzes conversations to which it is not a party.  Accordingly, Braze itself is collecting the content of any conversation to analyze for audience and marketing aggregation purposes before being provided to any entity that was a party to the conversation (like Defendants).

60.     As such, App users are not informed that their communications and private information are being contemporaneously intercepted and/or recorded by Braze, nor do App users provide their prior consent to the same.

**H.      Defendants Violate Users' Privacy For Marketing, Advertising, And Analytics Purposes**

61.     Defendants disclose users' personally identifiable information to Braze and enable Braze to intercept users' confidential communications with Defendants so that Braze can assist Defendants with marketing, advertising, and analytics.

62.     As alleged above, the Braze Service is designed to analyze the App data and marketing campaigns, conduct targeted advertising, and ultimately boost Defendants' revenue.

1 *Saunders v. Hearst Television, Inc.*, 711 F. Supp. 3d 24, 32 (D. Mass. 2024) (disclosures to Braze

2 for "marketing, advertising, and analytics [] do not fall within the [ordinary course of business]

3 exception's narrow list of permissible uses") (cleaned up); *In re Hulu Priv. Litig.*, 2012 WL

4 3282960, at *7 (N.D. Cal. Aug. 10, 2012) (disclosures to Facebook for "[m]arket research and web

5 analytics are not in the ordinary course of Hulu's business of delivering video content to

6 consumers").

7     **I.**    **Plaintiff Kroskey's Experience**

8     63.    Plaintiff Kroskey subscribed to Defendants' paid membership of the Balance

9 meditation App in July 2023.  He created his account using an email address which contains his

10 real first and last name.

11     64.    When Plaintiff Kroskey subscribed to Balance, he answered Defendants'

12 onboarding Survey thereby communicating to Defendants details about his past experience with

13 meditation, what personal issues he wanted to address with meditation, and his preferences for

14 doing meditation.

15     65.    Plaintiff Kroskey then used this Balance membership to view the pre-recorded

16 meditation videos Defendants offer on the App.  Plaintiff Kroskey frequently visited the Balance

17 App to view meditation videos during his subscription period.

18     66.    Unbeknownst to Plaintiff Kroskey, Defendants installed Braze's software on the

19 App, thereby enabling Braze to intercept his answers to the Survey while these communications

20 were in transit.  Defendants did not procure Plaintiff's consent to engage in aiding Braze's

21 interception of Plaintiff's communications.

22     67.    Further, each time Plaintiff Kroskey watched a meditation video, Defendants also

23 disclosed the name of the video Plaintiff watched, along with his email address and full name to

24 Braze.  Defendants did not obtain Plaintiff Kroskey's consent to disclose his video viewing history,

25 email address, and full name to Braze.  Plaintiff did not discover, and could not have discovered,

26 this violation. until November 2024 upon his retention of counsel.

27

28

## CLASS ALLEGATIONS

68.    **Nationwide Class.**  Plaintiff Kroskey seeks to represent a class of similarly situated

individuals defined as:

> All persons in the United States who subscribed to Defendants' Balance Meditation App
> who watched a pre-recorded video on the App and had their PII and video-viewing
> information disclosed to a third party (the "Class").

69.    **California Subclass.**  Plaintiff Kroskey also seeks to represent a California

Subclass defined as:

> All persons in California who subscribed to Defendants' Balance Meditation App service
> and (1) watched a pre-record video on the App and had their PII and video-viewing
> information disclosed to a third party and (2) answered Defendants' Survey and had their
> confidential communications intercepted by a third party while in California (the
> "California Subclass").

70.    The Class and California Subclass shall be collectively referred to as the "Classes."

71.    Subject to additional information obtained through further investigation and

discovery, the above-described Classes may be modified or narrowed as appropriate, including

through the use of multi-state subclasses.

72.    **Numerosity (Fed. R. Civ. P. 23(a)(1)):** Class Members are so numerous that

joinder of all members is impracticable.  Plaintiff believes that there are thousands of Balance App

consumers who are Class and California Subclass members and who have been damaged by

Defendants' unlawful practices.

73.    **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2), 23(b)(3)):** There is a

well-defined community of interest in the questions of law and fact involved in this case.

Questions of law and fact common to the members of the Classes that predominate over questions

that may affect individual members of the Classes include but are not limited to:

      (i)     Whether Defendants disclosed Plaintiff's and the Classes'
             PII to Braze in violation of the VPPA and Cal. Civ. Code §
             1799.3;

      (ii)    Whether Defendants' disclosures were committed
             knowingly and intentionally;

(iii)   Whether Braze intercepted, recorded, or eavesdropped upon Plaintiff's and the Classes' confidential communications;

(iv)   Whether Defendants disclosed Plaintiff's and the Classes' PII without their consent; and

(v)   Whether Plaintiff and the Classes are entitled to damages.

74.    **Typicality (Fed. R. Civ. P. 23(a)(3)):** Plaintiff's claims are typical of those of the Classes because Plaintiff, like all members of the Classes, watched pre-recorded videos on the App, had his PII and video-viewing information disclosed to third parties, completed the Survey, and had his personal answers to the survey intercepted by Braze.

75.    **Adequacy (Fed. R. Civ. P. 23(a)(4)):** Plaintiff has retained and is represented by qualified and competent counsel who are highly experienced in complex consumer class action litigation, including VPPA, Cal. Civ. Code § 1799.3, and CIPA actions.  Plaintiff and his counsel are committed to vigorously prosecuting this class action.  Moreover, Plaintiff is able to fairly and adequately represent and protect the interests of the Classes.  Neither Plaintiff nor their counsel have any interest adverse to, or in conflict with, the interests of the absent members of the Classes. Plaintiff has raised viable statutory claims, or the type reasonably expected to be raised by members of the Classes and will vigorously pursue those claims.  If necessary, Plaintiff may seek leave of this Court to amend this Class Action Complaint to include additional representatives to represent the Classes, additional claims as may be appropriate, or to amend the definition of the Classes to address any steps that Defendants took.

76.    **Superiority (Fed. R. Civ. P. 23(b)(3)):** A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all members of the Classes is impracticable.  Even if every member of the Classes could afford to pursue individual litigation, the court system could not.  It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. Individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments, and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues.  By contrast, the maintenance of this action

1    as a class action, with respect to some or all of the issues presented herein, presents few

2    management difficulties, conserves the resources of the parties and of the court system and protects

3    the rights of each member of the Classes.  Plaintiff anticipates no difficulty in the management of

4    this action as a class action.

### CAUSES OF ACTION

### COUNT I
**Violation Of The VPPA**
**18 U.S.C. § 2710, *et seq.***
**(On Behalf Plaintiff and the Class)**

77.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

78.    Plaintiff brings this claim individually and on behalf of the members of the

proposed Class against Defendants.

79.    Defendants are "video tape service provider[s]" as defined by the VPPA because

they "engage[s] in the business, in or affecting interstate or foreign commerce, of rental, sale, or

delivery of prerecorded video cassette tapes or similar audio visual materials," 18 U.S.C.

§ 2710(a)(4).  In particular, Defendants provide a library of pre-recorded meditation audiovisual

materials for consumers via their App.

80.    Plaintiff and Class members are "consumers" as defined by the VPPA because they

created a Balance App account.  18 U.S.C. § 2710(a)(1).  Specifically, Plaintiff obtained a paid,

annual subscription of the Balance App service to obtain full access to the library of pre-recorded

audiovisual materials.  Under the VPPA, therefore, Plaintiff Class members are "subscribers" of

"goods or services from a video tape service provider."  *See* 18 U.S.C. § 2710(a)(1).

81.    Plaintiff and Class members requested and obtained pre-recorded videos on the

App.  During these occasions, Defendants disclosed Plaintiff's and Class members' PII and video-

viewing information to Braze.  This PII included their email address and full name, along with the

title of the video they watched.

82.    The information disclosed by Defendants to Braze constitutes "personally

identifiable information," 18 U.S.C. § 2710(a)(3), because it enables an even ordinary person to

identify which specific pre-recorded videos were requested and obtained by which specific Class

member, including but not limited to Plaintiff.

83.     Defendants disclosed Plaintiff's and Class members' PII and video-viewing information to Braze "knowingly" because Defendants chose to implement Braze's Services on the App and controlled its functionality, including what information would be disclosed to Braze.  *See* 18 U.S.C. § 2710(b)(1).  Further, such disclosures were not for "debt collection activities, order fulfillment, request processing, and the transfer of ownership," and therefore did not fall within the "ordinary course of business."  18 U.S.C. § 2710(a)(2).

84.     Defendants did not obtain Plaintiff's and Class Members' consent to disclose their PII and video-viewing information to Braze "in a form distinct and separate from any form setting forth other legal or financial obligations."  18 U.S.C. § 2710(b)(2)(B)(i).  Nor were Plaintiff and Class members given the opportunity to prevent the disclosure of their PII and video-viewing information to Braze, "in a form distinct and separate from any form setting forth other legal or financial obligations," and where they were provided with the "opportunity, in a clear and conspicuous manner … to withdraw on a case-by-case basis or to withdraw from ongoing disclosures."  18 U.S.C. § 2710(b)(2)(B)(iii).

85.     On behalf of himself and the Class, Plaintiff seeks: (i) declaratory relief; (ii) equitable relief as is necessary to protect his interests and the interests of the Class by requiring Defendants to comply with the VPPA's requirements; (iii) statutory damages of $2,500 for each violation of the VPPA pursuant to 18 U.S.C. § 2710(c); and (iv) reasonable attorneys' fees, costs, and other litigation expenses.

## COUNT II
### Violation of California Civil Code § 1799.3
### (On Behalf of Plaintiff and the California Subclass)

86.     Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

87.     Plaintiff brings this claim individually and on behalf of the members of the proposed California Subclass against Defendants.

88.     Cal. Civ. Code § 1799.3(a) prohibits a "person providing video recording sale or rental services" from disclosing "any personal information or the contents of any record, including

sales or rental information, which is prepared or maintained by that person, to any person, other than the individual who is the subject of the record, without the written consent of that individual."

89.    Defendants are "person[s] providing video recording sales or rental services" because they sell access to their library of videos on the App for an annual fee of $69.99. Alternatively, Defendants rent access to their library of videos by charging a subscription fee of $69.99 for a consumer to have access to Defendants' library of videos for a period of a year.

90.    Defendants disclosed to a third party, Braze, Plaintiff's and Subclass members' personal information.  Defendants utilized the Braze Services to compel Plaintiff's and Subclass members' internet-connected smartphone applications to transfer Plaintiff's personal information, like their emails and full name, and event data, like the title of the videos they viewed to Braze.

91.    Plaintiff and the Subclass members viewed and accessed the videos using their accounts on the Balance App.

92.    Defendants knowingly disclosed Plaintiff's and California Subclass members' PII because they used the data and installed Braze Services in the background of their mobile App for targeted advertising and remarketing.

93.    Plaintiff and California Subclass members did not provide Defendants with any form of consent—either written or otherwise—to disclose their PII to third parties.

94.    On behalf of himself and the California Subclass, Plaintiff seeks: (i) declaratory relief; (ii) injunctive and equitable relief as necessary to protect the interests of Plaintiff and the Subclass by requiring Defendants comply with Cal. Civ. Code § 1799.3's requirements for protecting a consumer's PII; (iii) statutory damages of $500 for each violation of this law pursuant to Cal. Civ. Code § 1799.3(c), and (iv) reasonable attorneys' fees and costs and other litigation expenses.

### COUNT III
**Violation Of The California Invasion Of Privacy Act,
Cal. Penal Code § 631(a)
(On Behalf of Plaintiff and the California Subclass)**

95.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

96.    Plaintiff brings this claim individually and on behalf of the California Subclass

against Defendants.

97.    CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978).  Thus, to establish liability under CIPA § 631(a), a plaintiff need only establish that the defendants, "by means of any machine, instrument, contrivance, or in any other manner," do any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> *Or*
>
> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,
>
> *Or*
>
> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,
>
> *Or*
>
> Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

98.    CIPA § 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email.  *See Matera,* 2016 WL 8200619, at *21 (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *see also Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

99.    The Braze Service is a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

100.     Braze is a "separate legal entity that offers 'software-as-a-service' and not merely a passive device." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021).  Further, Braze has the capability to use the wiretapped information for a purpose other than simply recording the communications and providing the communications to Defendants.  This includes analytics for Defendants to further monetize their services.  Accordingly, Braze is a third party to any communication between Plaintiff and California Subclass members, on the one hand, and Defendants, on the other.  *Id*. at 521; *see also Javier*, *v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

101.     At all relevant times, Braze willfully and without the consent of all parties to the communication, and in an unauthorized manner, read, attempted to read, and learned the contents of the electronic communications of Plaintiff and California Subclass members, on the one hand, and Defendants, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

102.     At all relevant times, Defendants aided, agreed with, employed, or otherwise enabled Braze to intercept the electronic communications of Plaintiff and California Subclass Members.

103.     Plaintiff and California Subclass members did not provide their prior consent to Braze's intentional interception, reading, learning, recording, collection, and usage of Plaintiff's and Subclass Members' electronic communications.  Nor did Plaintiff and Subclass members provide their prior consent to Defendants aiding, agreeing with, employing, or otherwise enabling the same.

104.     The wiretapping of Plaintiff and California Subclass members occurred in California, where Plaintiff and Subclass members accessed the App, and where Braze—as enabled by Defendants—routed Plaintiff's and California Subclass Members' electronic communications to Braze's servers.

105.     Pursuant to Cal. Penal Code § 637.2, Plaintiff and California Subclass Members have been injured by Defendants' violations of CIPA § 631(a), and each seeks statutory damages of $5,000 for each of Defendants' violations of CIPA § 631(a).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks a judgment against Defendants, on behalf of himself and all others similarly situated, as follows:

(a)     For an order certifying the Classes pursuant Fed. R. Civ. P. 23, naming Plaintiff as representative of the Classes, and naming Plaintiff's attorneys as Class Counsel to represent the Classes;

(b)     For an order declaring that Defendants' conduct violates the statutes referenced herein;

(c)     For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

(d)     An award of statutory damages to the extent available;

(e)     For punitive damages, as warranted, in an amount to be determined at trial;

(f)     For prejudgment interest on all amounts awarded; and

(g)     For an order awarding Plaintiff and the Classes their reasonable attorneys' fees and expenses and costs of suit.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury of any and all issues so triable.

Dated: November 18, 2024                                Respectfully submitted,

                                                        **BURSOR & FISHER, P.A**.

                                                        By: */s/ Neal J. Deckant*

                                                        Neal J. Deckant (State Bar No. 322946)
                                                        Ines Diaz Villafana (State Bar No. 354099)
                                                        Joshua B. Glatt (State Bar No. 354064)
                                                        1990 North California Blvd., 9th Floor
                                                        Walnut Creek, CA 94596
                                                        Telephone:  (925) 300-4455
                                                        Facsimile:  (925) 407-2700
                                                        Email:  ndeckant@bursor.com
                                                             idiaz@bursor.com
                                                             jglatt@bursor.com

                                                        *Attorneys for Plaintiff*