**BURSOR & FISHER, P.A.**
Neal J. Deckant (State Bar No. 322946)
Ines Diaz Villafana (State Bar No. 354099)
Joshua B. Glatt (State Bar No. 354064)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
Email: ndeckant@bursor.com
   idiaz@bursor.com
   jglatt@bursor.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JONATHAN KROSKEY, individually and on behalf of all others similarly situated,<br><br>           Plaintiff,<br><br> v.<br><br><br>ELEVATE LABS, LLC and MINDSNACKS, INC.,<br><br>        Defendants. | Case No. 5:24-cv-08113-EJD<br><br>**STATEMENT OF RECENT DECISION**<br><br>Judge:  Hon. Edward J. Davila |

Pursuant to Local Civil Rule 7-3(d)(2), Plaintiff Jonathan Kroskey ("Plaintiff") respectfully submits this Statement of Recent Decision to bring to the Court's attention relevant authority issued after Defendants' Motion to Compel Arbitration (ECF No. 14) was fully briefed.

On February 27, 2025, the United States Court of Appeals, Ninth Circuit issued a decision in *Chabolla v. ClassPass Inc.,* No. 23-15999, 2025 WL 630813, affirming the Northern District of California's denial of the defendants' motion to compel arbitration. A copy of the order is attached for the Court's reference as **Exhibit A**.


Dated:  March 13, 2025                **BURSOR & FISHER, P.A**.

                                      By:  ___/s/ *Neal J. Deckant*_____
                                              Neal J. Deckant

                                      Neal J. Deckant (State Bar No. 322946)
                                      Ines Diaz Villafana (State Bar No. 354099)
                                      Joshua B. Glatt (State Bar No. 354064)
                                      1990 North California Blvd., 9th Floor
                                      Walnut Creek, CA 94596
                                      Telephone: (925) 300-4455
                                      Facsimile:  (925) 407-2700
                                      Email: ndeckant@bursor.com
                                              idiaz@bursor.com
                                              jglatt@bursor.com

                                      *Attorneys for Plaintiff*

**EXHIBIT A**

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| KATHERINE CHABOLLA, Individually and on Behalf of All Others Similarly Situated, | No. 23-15999 |
| *Plaintiff-Appellee*, | D.C. No. 4:23-cv-00429-YGR |
| v. | OPINION |
| CLASSPASS INC.; CLASSPASS, LLC; CLASSPASS USA, LLC, | |
| *Defendants-Appellants*. | |

Appeal from the United States District Court
for the Northern District of California
Yvonne Gonzalez Rogers, District Judge, Presiding

Argued and Submitted September 11, 2024
San Francisco, California

Filed February 27, 2025

Before: Jay S. Bybee, Salvador Mendoza, Jr., Circuit
Judges, and Michael W. Fitzgerald,[*] District Judge.

---

[*] The Honorable Michael W. Fitzgerald, United States District Judge for
the Central District of California, sitting by designation.

2          CHABOLLA v. CLASSPASS, INC.

Opinion by Judge Mendoza;
Dissent by Judge Bybee

## SUMMARY[**]

### Arbitration

The panel affirmed the district court's order denying ClassPass, Inc.'s motion to compel arbitration in a case in which plaintiff filed a complaint, on behalf of herself and a class of California consumers similarly charged for an auto-renewed subscription, alleging that ClassPass—a company that offers packaged-deal access to gyms, fitness studios, and fitness classes—violated California's Automatic Renewal Law, Unfair Competition Law, and Consumers Legal Remedies Act.

Plaintiff purchased an online subscription. ClassPass did not charge plaintiff's account for months during the COVID-19 pandemic, but when gym operations resumed so did ClassPass's charges. ClassPass argued that when plaintiff used its website, she agreed to arbitrate any claims against it.

Because ClassPass's website provides a link to the Terms of Use but does not require that the user actually read them before moving on to purchase a subscription, the website most closely resembles a "sign-in wrap agreement."

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Plaintiff navigated through four webpages to purchase her subscription: the landing page and screens 1, 2, and 3.

The panel held that neither the landing page nor screen 1 provided plaintiff with reasonably conspicuous notice of the Terms of Use. Even if screens 2 and 3 did, at no point did plaintiff unambiguously manifest her assent to the Terms of Use on those screens. Nor did plaintiff's use of the website, viewed in total, amount to her unambiguous manifestation of assent to the Terms of Use. Plaintiff did not agree to be bound to the arbitration clause within those Terms of Use.

Dissenting, Judge Bybee would hold that plaintiff agreed to ClassPass's Terms of Use. The screens, considered individually, required plaintiff to manifest her assent to the Terms of Use. When considering all three screens together, that conclusion is overwhelming. Plaintiff received three conspicuous notices of the Terms and unambiguously assented three times during the sign-up process. This was enough to bind her in contract. He would reverse the judgment of the district court and order the arbitration provision enforced.

---

## COUNSEL

Jessica L. Hunter (argued), Wittels McInturff Palikovic, New York, New York; Daniel E. Birkhaeuser, Robert M. Bramson, and Alan R. Plutzik, Bramson Plutzik Mahler & Birkhaeuser LLP, Walnut Creek, California; for Plaintiff-Appellee.

Benjamin G. Shatz (argued), Christine M. Reilly, and Justin J. Rodriguez, Manatt Phelps & Phillips LLP, Los Angeles, California, for Defendants-Appellants.

**OPINION**

MENDOZA, Circuit Judge:

Like many wishful thinkers, Katherine Chabolla started off 2020 by resolving to improve her fitness and wellness. So that January, she went online and purchased a trial subscription with ClassPass, a company offering packaged-deal access to gyms, fitness studios, and fitness classes. Putting many of us to shame, her New Year's resolution lasted through February. But March brought with it a global pandemic, and California's gyms and studios closed their doors. ClassPass did not charge Chabolla's account for months, but when operations resumed so did ClassPass's charges. Chabolla sued, alleging the resumed charges violated California law. ClassPass argues that when Chabolla used its website, she agreed to arbitrate any claims against it.

We are presented with a question of ever-increasing ubiquity in today's e-commerce world: whether an internet user's online activities bound her to certain terms and conditions. We do not know if Chabolla's New Year's resolution survived 2020. But as to her claim in federal court, we hold that it survives ClassPass's motion to compel arbitration and affirm.

## I. BACKGROUND

### A. Underlying Factual History

ClassPass[1] sells subscription packages that grant subscribers access to an assortment of gyms, studios, and fitness and wellness classes. On January 30, 2020, California resident Katherine Chabolla ("Chabolla") purchased a one-month subscription at a discounted rate, subject to monthly renewal at the standard rate. As discussed in greater detail below, the website required that Chabolla navigate through several webpages to complete her purchase. She did so and availed herself of ClassPass's partner gyms and studios over the following weeks.

In March 2020, the COVID-19 pandemic and government response closed California's gyms, studios, and fitness and wellness classes, and ClassPass paused its monthly charges. A little over a year later, ClassPass resumed charging subscribers, including Chabolla. The particulars of those resumed payments and ClassPass's billing practices are not at issue in this interlocutory appeal.

### B. ClassPass's Website

Chabolla navigated through four webpages to purchase her subscription, which we will call the "landing page" and "screens 1, 2, and 3." Representative examples of each are

---

[1] "ClassPass, LLC" succeeded "ClassPass, Inc." on March 30, 2022. **"**ClassPass USA LLC" is a subsidiary of "ClassPass, LLC." There is no dispute over which entity is the proper defendant, and we collectively refer to them as "ClassPass."

6          CHABOLLA V. CLASSPASS, INC.

found in the appendix; this summary recounts their relevant features.[2]

The landing page—the first page Chabolla encountered—invited the user to join ClassPass at various discounted rates. Chabolla selected a 45-Credit plan, which cost $39 for the first month, then $79 for subsequent months. Below the listed rates was a large blue button labeled "Continue." Clicking the "Continue" button took the user to screen 1. The landing page contained no language indicating that a subscription is governed by any additional terms or conditions not listed on the page.

Screen 1 again invited the user to join ClassPass and described the selected discount. The right third of screen 1 contained action items, including directions to "[e]nter your email to continue," a field to do so, and another "Continue" button. Below that was a divider, " —or —", that separated the "Continue" button from an equal-sized "Sign up with Facebook" button. Below that, in the smallest font on the page, read "By clicking 'Sign up with Facebook' or 'Continue,' I agree to the Terms of Use and Privacy Policy." The words "Terms of Use" and "Privacy Policy" were in

---

[2] ClassPass provides images of webpages that its Marketing Director explained are "in substantially the same form as [they] would have been presented to Ms. Chabolla on January 30, 2020." The parties are satisfied that these images sufficiently represent the webpages that Chabolla saw such that we may rely on these images to decide the legal issues in this appeal. So, we too are satisfied with the images. *See Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005, 1015 (9th Cir. 2024) ("[W]here the authenticity of screenshots is not subject to factual dispute, courts may decide the issue [of constructive notice] as a pure question of law.'" (quoting *Oberstein v. Live Nation Ent. Inc.*, 60 F.4th 505, 518 (9th Cir. 2023)).

CHABOLLA v. CLASSPASS, INC.                    7

blue, while the rest of the text was in gray. Entering an email address and clicking "Continue" took the user to screen 2.

Screen 2 retained much of screen 1 but the action items on the right third of the page were new. Screen 2's right third now asked "What's your name?" and provided fields for a first and last name. Below those fields, in the same small font from screen 1 appeared the text: "By signing up you agree to our Terms of Use and Privacy Policy." Again, "Terms of Use" and "Privacy Policy" were in blue while the rest of the font was in gray. Below that text appeared another "Continue" button. Entering a first and last name and clicking the "Continue" button took the user to screen 3.

Screen 3 was a checkout page that described the selected discount, the amount owed, and the details of the offer. The right third of the screen provided fields to enter payment information. Below those fields the site presented a collection of payment options, including text asking the user if she had "Received a ClassPass gift card?" in blue font. Below this question appeared the same small font from screens 1 and 2, which read "I understand that my membership will automatically renew to the [$79] per month plan plus applicable tax until I cancel. I agree to the Terms of Use and Privacy Policy." And again, "Terms of Use" and "Privacy Policy" were in blue while the rest of the text was in gray. Below that text was a button labeled "Redeem now."

On screens 1, 2, and 3, the small blue text reading "Terms of Use" and "Privacy Policy" (smaller than the font for screen 3's "Received a ClassPass gift card?") contained

hyperlinks that took the user to those documents. The second paragraph of the Terms of Use explains that

> THESE TERMS CONTAIN A BINDING
> ARBITRATION AGREEMENT AND
> CLASS ACTION WAIVER THAT
> REQUIRE YOU TO ARBITRATE ALL
> DISPUTES YOU HAVE WITH CLASS
> PASS [sic] ON AN INDIVIDUAL
> BASIS . . . .   YOU EXPRESSLY AGREE
> THAT DISPUTES BETWEEN YOU AND
> CLASSPASS WILL BE RESOLVED BY
> BINDING, INDIVIDUAL ARBITRATION,
> AND YOU HEREBY WAIVE YOUR
> RIGHT TO PARTICIPATE IN A CLASS
> ACTION LAWSUIT OR CLASS WIDE
> ARBITRATION.

"Section 18" is the "Arbitration Agreement," outlining arbitration procedures in greater detail, including that "all disputes between you and ClassPass shall be resolved by binding arbitration."

## C.  The Litigation

Chabolla filed a complaint in the Northern District of California on behalf of herself and a class of California consumers that ClassPass similarly charged for an auto-renewed subscription.  She alleges ClassPass violated California's Automatic Renewal Law, Unfair Competition Law, and Consumers Legal Remedies Act. ClassPass filed a Motion to Compel Arbitration, seeking dismissal or a stay of proceedings during arbitration.  The district court denied the motion.  This appeal follows.

CHABOLLA V. CLASSPASS, INC.                    9

## II. JURISDICTION & STANDARD OF REVIEW

We have jurisdiction over the interlocutory appeal of an order denying a motion to compel arbitration under the Federal Arbitration Act ("FAA"). 9 U.S.C. § 16(a)(1)(B); *Lopez v. Aircraft Serv. Int'l*, 107 F.4th 1096, 1097 (9th Cir. 2024); *Ortiz v. Randstad Inhouse Servs., LLC*, 95 F.4th 1152, 1158 (9th Cir. 2024). We review a district court's denial of a motion to compel arbitration de novo and any underlying findings of fact for clear error. *Lopez*, 107 F.4th at 1098 (quoting *Bielski v. Coinbase*, 87 F.4th 1003, 1008 (9th Cir. 2023)). The party seeking to compel arbitration bears the burden of proving the existence of an agreement to arbitrate by a preponderance of evidence. *Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005, 1014 (9th Cir. 2024) (citing *Johnson v. Walmart Inc.*, 57 F.4th 677, 681 (9th Cir. 2023)).

## III. DISCUSSION

As Ross Geller and Chandler Bing once learned the hard way, there are few contracts more difficult to escape than those for gym memberships.**[3]** But to hold Chabolla to an arbitration clause we must discern whether she entered into such a contract in the first place. *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 855 (9th Cir. 2022) ("The [FAA] requires district courts to compel arbitration of claims covered by an *enforceable* arbitration agreement." (citing 9 U.S.C. § 3) (emphasis added)); *see also Lifescan, Inc. v. Premier Diabetic Servs., Inc.*, 363 F.3d 1010, 1012 (9th Cir. 2004) (citing 9 U.S.C. § 4). "In determining whether the parties have agreed to arbitrate a particular

---

[3] *Friends: The One with the Ballroom Dancing* (NBC television broadcast Oct. 16, 1997).

dispute, federal courts apply state-law principles of contract formation." *Oberstein*, 60 F.4th at 510 (quoting *Berman*, 30 F.4th at 855).

Online contracts are subject to the same elemental principles of contract formation as paper contracts. *Berman*, 30 F.4th at 855–56. "To form a contract under California . . . law, there must be actual or constructive notice of the agreement and the parties must manifest mutual assent." *Oberstein*, 60 F.4th at 512–13 (citing *Berman*, 30 F.4th at 855).[4] A party may manifest assent through conduct. *Berman*, 30 F.4th at 855. To do so, the party must intend the conduct and know, or have reason to know, the other party may infer her assent from the conduct. *Id.*

In the world of internet contracts, there are browsewrap, clickwrap, scrollwrap, and sign-in wrap agreements, each of which purport to bind users through different "assent" mechanisms. *Keebaugh*, 100 F.4th at 1014. In a browsewrap, the "user accepts a website's terms of use merely by browsing the site," although those terms are not always immediately apparent on the screen. *Id.* (quoting *Sellers v. JustAnswer LLC*, 289 Cal. Rptr. 3d 1, 15 (Ct. App.

---

[4] On appeal, the parties agree that our *Berman* and *Oberstein* decisions are controlling. 30 F.4th at 855; 60 F.4th at 510. In *Berman*, we applied California law but observed that New York has "substantially similar rules" and either state's law would lead to the same result. 30 F.4th at 855 (citing *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017) and *Nguyen v. Barnes & Noble, Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014) (internal quotation marks omitted)). In *Oberstein*, we applied California law. 60 F.4th at 510. Neither party asks us to depart from the forum state's law; each advocates its case under the forum state's law and, to whatever extent an argument for applying New York law can be made, we find no substantive difference between New York and California law affecting the outcome of this case. *See Berman*, 30 F.4th at 855. Therefore, we apply California law.

2021)). Courts consistently decline to enforce browsewraps. *Id.* (citing *Nguyen v. Barnes & Noble, Inc.*, 763 F.3d 1171, 1178–79 (9th Cir. 2014)). In a clickwrap, the website presents its terms of use in a "pop-up screen" and the user accepts those terms by clicking or checking a box stating she agrees. *Oberstein*, 60 F.4th at 513. Courts routinely enforce clickwraps. *Id.* In a scrollwrap, which provides "the strongest notice" and are usually enforced, the user must scroll through all the terms before the website allows her to click a box to agree. *Keebaugh*, 100 F.4th at 1014 (citing *Sellers*, 289 Cal. Rptr. 3d at 15). Finally, a sign-in wrap lives somewhere in the middle: the website provides a link to terms of use and indicates that some action may bind the user but does not require that the user actually review those terms. *Id.*

The parties agree that ClassPass's website resembles something between clickwrap and browsewrap. Because ClassPass's website provides a link to the Terms of Use but does not require that the user actually read them before moving on to purchase a subscription, the website most closely resembles a "sign-in wrap agreement." *Id.* Like all online contracts, "a sign-in wrap agreement may be an enforceable contract based on inquiry notice if (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Id.* (quotation marks omitted).

## A. Reasonably Conspicuous Notice of Terms

"To be conspicuous, [the] notice 'must be displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it.'"

*Keebaugh*, 100 F.4th at 1014 (quoting *Berman*, 30 F.4th at 856). The "context of the transaction," as well as the "traditional inquiry related to the visuals involved with the notice, such as font size, text placement, and overall screen design," inform whether a website provides reasonably conspicuous notice of the terms of an agreement. *Id.* at 1019 (citing *Oberstein*, 60 F.4th at 516; *B.D. v. Blizzard Ent., Inc.*, 292 Cal. Rptr. 3d 47, 62 (Ct. App. 2022); *Sellers*, 289 Cal. Rptr. 3d at 26). The nature of the service or goods offered and the visual aspects of every page of a multi-page transaction should be considered together. *See Oberstein*, 60 F.4th at 515–16 ("[T]he inquiry has always been context- and fact-specific." (quotation marks omitted)); *Sellers*, 289 Cal. Rptr. 3d at 26–28.

### i. Context of the Transaction

The nature of an agreement may anticipate "some sort of continuing relationship . . . that would require some terms and conditions[.]" *Sellers*, 289 Cal. Rptr. 3d at 26 (emphasis omitted); *see Keebaugh*, 100 F.4th at 1019. A user should expect that certain relationships are bound by terms, even if not explicitly told. *See Keebaugh*, 100 F.4th at 1020 (finding that users who download and play a mobile game that includes in-app purchases should expect a continuing relationship with the developer governed by terms of use); *Oberstein*, 60 F.4th at 517 (finding that users who make an account with a ticket purchasing website through a "full registration process" should expect "'some sort of continuing relationship' that would have put users on notice for a link to the terms of that continuing relationship."). Conversely, when a user simply purchases goods or avails herself of a one-time discount offer, there is less reason for her to expect a continued relationship beyond the purchase. *Sellers*, 289 Cal. Rptr. 3d at 25; *see also Berman*, 30 F.4th at

869 (Baker, J., concurring) ("In this case involving one-off transactions, reasonably prudent users of defendants' sites are unlikely to be on the lookout for fine print.").

Taken as a whole, the landing page and screens 1, 2, and 3 give some indication of a continuing relationship. The user is invited to "join ClassPass" and the purchase is described as a "plan" or "a membership." The point of ClassPass is to gain access to gyms, studios, and classes for fitness and wellness benefits, a proposition that should conjure in reasonable minds at least the specter of continuing habit. On the other hand, users are advised that they are "never locked in," that there are "no commitments," and that they can "cancel anytime." The user does not create a username or password and is not asked to make an account. The "offer" is for "1 month," and the user purchases "45 credits" to be traded in for classes. The user concludes the transaction by "redeeming" that offer. The transaction could easily be considered a one-time purchase of credits at a discounted rate to be traded in at gyms and studios, rather than the formation of an ongoing relationship with ClassPass.

The transaction here abstractly resembles the one at issue in *Sellers*, where the users availed themselves of a trial opportunity and did not anticipate any ongoing relationship after a one-time use of services. 289 Cal. Rptr. at 26. As we said previously of *Sellers*: "[u]nlike a user who signs up for an account and 'clearly contemplate[s] some sort of continuing relationship,' the users of the website at issue were merely attempting to start a free trial, making it less likely that they would 'scrutin[ize] the page for small text outside the payment box or at the bottom of the screen linking them to 26 pages of contractual terms.'" *Oberstein*, 60 F.4th at 516 (quoting *Sellers*, 289 Cal. Rptr. at 26) (alterations in original). But the transaction is also reflective

of the one in *Oberstein*, where users made accounts and needed to use their accounts to purchase tickets. *See id.* at 517. The "context of th[at] transaction . . . put users on notice for a link to the terms of that continuing relationship." *Id.*

Viewed as a whole, the "context of the transaction" at issue here neither weighs in favor of nor against the notice requirement. We decline to find that Chabolla had *zero* indication her relationship with ClassPass would be ongoing. But we also decline to find that the nature of whatever relationship formed gave her reason to look for additional terms and conditions not explicitly listed on ClassPass's website. Given that it is ClassPass's burden to establish "the existence of an agreement to arbitrate," *Keebaugh*, 100 F.4th at 1013, and that "the onus must be on website owners to put users on notice of the terms to which they wish to bind consumers," *Sellers*, 289 Cal. Rptr. 3d at 20 (quotation marks omitted), we cannot find the vague nature of business with ClassPass alerted Chabolla to look for additional terms.

### ii. Visual Aspects of the Website

"Website users are entitled to assume that important provisions—such as those that disclose the existence of proposed contractual terms—will be prominently displayed, not buried in fine print." *Berman*, 30 F.4th at 857. "While terms may be disclosed through hyperlinks, the presence of a hyperlink 'must be readily apparent,' and '[s]imply underscoring words or phrases . . . will often be insufficient to alert a reasonably prudent user that a clickable link exists.'" *Keebaugh*, 100 F.4th at 1014 (quoting *Berman*, 30 F.4th at 857) (alteration in original). "This court looks to 'the conspicuousness and placement of the Terms of Use

hyperlink, other notices given to users of the terms of use, and the website's general design' in determining 'whether a reasonably prudent user would have inquiry notice of a [sign-in wrap] agreement.'" *Oberstein*, 60 F.4th at 515 (quoting *Nguyen*, 763 F.3d at 1177); *see Keebaugh*, 100 F.4th at 1020–21 (applying *Berman* and *Oberstein* to a sign-in wrap agreement).

Neither party argues that the landing page is significant to the dispute. Indeed, the landing page presents no indication that a membership is conditioned upon terms beyond those explicitly listed (that the offer is for new members only, the offer cannot be combined with other offers, and there are no limits to how often a member can visit a studio).

Screens 1, 2, and 3 present the Terms of Use by hyperlink within a short one- or two-sentence advisory paragraph written in a small gray font against a white background, with "Terms of Use" and "Privacy Policy" written in blue. For a hyperlink to be reasonably conspicuous, it must be denoted by design elements tailored to notify the reasonably prudent internet user of its presence. *Berman*, 30 F.4th at 857. In *Berman* and *Oberstein*, we indicated that the use of a blue font can be reasonably conspicuous. 30 F.4th at 857; 60 F.4th at 516; *see also Mahram v. Kroger*, 324 Cal. Rptr. 3d 575, 577 (Ct. App. 2024) (finding that terms noted by green text were sufficiently conspicuous). But there is no bright-line test for finding that a particular design element is adequate in every circumstance. We must instead consider how those design elements appear on the page. *See, e.g.*, *Berman*, 30 F.4th at 857 (finding "the textual notice is further deemphasized by the overall design of the webpage, in which other visual

elements draw the user's attention away from the barely readable critical text.").

Screen 1 contains text in varying font sizes and images of people exercising. The user is directed to the action box in the right third of the page and must enter an email to continue. For users (like Chabolla) who enter their email address, the most obvious and natural next step is to click "Continue." If a user continued to read down the page, they would see an option to "Sign up with Facebook." The notice of additional terms is found below the "Sign up with Facebook" option, on the periphery of where a user intending to use their email would be looking. A reasonably prudent user would likely click "Continue" and read no further if she had no intention of using Facebook. It is not apparent that a user agrees or commits to anything on screen 1 other than sharing her email address. Here, the notice seems to fade into the irrelevancy of other aspects of the page.

Compare, for example, the notices in *Oberstein* and *Patrick*, which we found sufficient for notice and which the dissent considers as conspicuous as the notice on screen 1. Dissent at 34. The *Oberstein* screens were less crowded and interjected notice of the terms and conditions directly above or below the relevant action item in a manner disrupting the natural flow of actions. *See Oberstein v. Live Nation Ent.*, No. 20-cv-3888, 2021 WL 4772885, at *5 (C.D. Cal. Sept. 20, 2021). The sign-in/sign up pages placed the notice directly below the necessary action items and above the sign-in button, and the payment screen placed it between the amount of money the user is about to pay and the place order button, *see id.*, a fact we found dispositive on appeal, *Oberstein*, 60 F.4th at 516–17. And in *Patrick*, the screen was also less crowded than screen 1, and notice was

prominently displayed directly below the only action button
on the page: the place order button. *Patrick v. Running
Warehouse, LLC*, No. 22-cv-9978, 2022 WL 10584136, at
*2 (C.D. Cal. Oct. 18, 2022), *aff'd*, 93 F.4th 468 (9th Cir.
2024). Comparatively, in *Berman*, where the notice was not
sufficient, there were superfluous items separating the
relevant action items from the notice. 30 F.4th at 859–60.

Screen 1 falls on the *Berman* side of the equation.
Because of the notice's distance from relevant action items,
its placement outside of the user's natural flow, and its
font—notably timid in both size and color, we find that it is
"deemphasized by the overall design of the webpage" and
not "prominently displayed" on screen 1. *Berman*, 30 F.4th
at 857.

On the other hand, screens 2 and 3 place the notice of the
Terms of Use more centrally. The question then becomes
whether this notice is sufficient. The notice remains the
smallest and grayest on the page, with blue hyperlinks. On
screen 2, it now interrupts the natural flow of the action items
in a manner closer to what we found adequate in *Oberstein*.
60 F.4th at 517 ("The notices were not buried on the bottom
of the webpage or placed outside the action box, but rather
were located directly on top of or below each action
button."). Similarly, on screen 3, the user must move past
the notice to continue. But the transition remains somewhat
muddled by language regarding gift cards, which may or
may not be relevant to the user's transaction. A reasonable
user could easily assume the notice pertains to gift cards and
hastily skim past it.

We decline to consider any further whether the notices
on screens 2 and 3 are conspicuous enough. The dissent says
we waffle. Dissent at 38–39. Not so. As discussed below,

18          CHABOLLA v. CLASSPASS, INC.

even if screens 2 and 3 provided notice of the Terms of Use, Chabolla had no means of manifesting her assent to those terms on those screens. We disagree that California's contract formation test can be met with broad reference to the conspicuousness of notice across three separate pages and a manifestation of assent constructed from three different action buttons. We must discern intent; this requires notice of contract terms as well as "unambiguous manifestation of assent to *those* terms[.]" *Patrick*, 93 F.4th at 475 (emphasis added). For example, it would be improper to infer that Chabolla manifested her assent on screen 1 to a notice she hadn't yet seen on screen 2. So further discussion on the conspicuousness of the notices on screens 2 and 3 would be non-dispositive and fruitless.

## B. Unambiguous Manifestation of Assent to Terms

Reasonable conspicuousness alone is not sufficient to bind a user—a user must agree to the terms, not merely see them. *Oberstein*, 60 F.4th at 515. "The second part of the test—whether the user takes some action that unambiguously manifests assent—is relatively straightforward." *Id.* (quoting *Berman*, 30 F.4th at 857). "A user's click of a button can be construed as an unambiguous manifestation of assent only if the user is explicitly advised that the act of clicking will constitute assent to the terms and conditions of an agreement." *Berman*, 30 F.4th at 857. "[T]he notice must explicitly notify a user of the legal significance of the action she must take to enter into a contractual agreement." *Id.* at 858.

Given that screen 1 fails to provide reasonably conspicuous notice of the Terms of Use, any action the user takes on the page cannot unambiguously manifest her assent to those terms. *See Oberstein*, 60 F.4th at 515. Notably,

screen 1 is the only screen where the language advises the user that by clicking a particular button they agree to the Terms of Use. The notice on screen 1 reads, "[b]y clicking 'Sign up with Facebook' or 'Continue,' I agree to the Terms of Use and Privacy Policy," and provides buttons with those options.

Conversely, the notice language on screens 2 and 3 is ambiguous. Screen 2 explains that "[b]y signing up you agree to our Terms of Use and Privacy Policy." There is no "sign up" button, and the only button on screen 2 reads "Continue." At no point on any screen is a user advised that a particular action has "signed her up" or will "sign her up," other than screen 1's option to "Sign up with Facebook." Rather than provide explicit instruction, screen 2 asks the user "What's your name?" and includes fields for a first name and last name. It is up to the user to assume that entering a first and last name and clicking the "Continue" button amounts to "signing up." The dissent finds that "the language could have been clearer"—indeed, the resulting ambiguity is dispositive. Dissent at 41. A website must "explicitly notify" a user of the legal significance of her actions and a manifestation of assent must be "unambiguous." *Berman*, 30 F.4th at 858. We find too much ambiguity in screen 2's language to find that a user binds herself to the Terms of Use by continuing past it.

Screen 3 resolves none of the ambiguity. The relevant notice language reads, "I agree to the Terms of Use and Privacy Policy," and the action button that follows is labeled "Redeem now." In *Berman*, we found near-identical language insufficient to amount to an unambiguous manifestation of assent. 30 F.4th at 858. There, the webpages stated "'I understand and agree to the <u>Terms & Conditions</u>,' but [] did not indicate to the user what action

would constitute assent to those terms and conditions." *Id.*
Further, in *Berman*, "the text of the button itself gave no
indication that it would bind plaintiffs to a set of terms and
conditions." *Id.* (explaining that the buttons at issue read
"This is correct, Continue!" and "Continue"). Similarly,
here, screen 3 fails to tell the user the significance of clicking
"Redeem now," and therefore fails to provide the
opportunity to unambiguously manifest assent to the Terms
of Use. Moreover, the presence of the "Received a
ClassPass gift card?" language further muddles the meaning
of "Redeem now"—a user may reasonably be left with the
impression that to "Redeem" means to "Redeem a gift card,"
rather than purchase a membership, much less manifest her
assent to additional terms.

The dissent observes that "ClassPass might have used
different language than 'Redeem now[.]'" Dissent at 42.
We agree, as does the case law. As we observed in *Berman*,
"[t]his notice defect could easily have been remedied by
including language such as, 'By clicking the Continue >>
button, you agree to the <u>Terms & Conditions</u>.'" 30 F.4th at
858 (citing *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 78–80
(2d Cir. 2017)). In fact, several courts, including ours, have
repeatedly found webpages that did so formed contracts. For
instance, in *Patrick*, clicking a "Place Order" button
unambiguously manifested assent because the website
explained that "by submitting an order, the consumer
'confirms [he] . . . agree[s] to our privacy policy and terms
of use.'" 93 F.4th at 477 (alterations in original). Similarly
in *Oberstein*, clicking a "Place Order" button and continuing
past webpages unambiguously manifested assent because
the website explained that "by clicking on this button, 'you
agree to our Terms of Use,'" "[b]y continuing past this page,
you agree to the Terms of Use," and "[b]y continuing past

this page and clicking 'Place Order', you agree to our Terms of Use." 60 F.4th at 515–16. In *Keebaugh*, clicking a "Play" button unambiguously manifested assent to additional terms because the screen advised that "[b]y tapping 'Play' I agree to the Terms of Service." 100 F.4th at 1020. And in *Mahram*, clicking a "Sign up with email" button unambiguously manifested assent because the website explained that "[b]y signing up, you agree to our Terms of Service." 324 Cal. Rptr. 3d at 577. In each of these cases, the website told the user what clicking a button meant. ClassPass's website provides no analogous language providing the user with an option to unambiguously agree to its Terms of Use.

Finally, ClassPass urges us to consider its "webflow" as a "multi-page enrollment process" and argues that "[a]ny reasonable Internet user would understand what she was doing." The dissent, too, suggests that considering all three screens together shows that a contract formed. Dissent at 44. However, three faulty notices do not equal a proper one. While ClassPass has a clear understanding of what it wanted its website to entail, we must consider "the breadth of the range of technological savvy of online purchasers[.]" *Sellers*, 289 Cal. Rptr. 3d at 20 (citations omitted). Viewed as a whole, the website offered an "[e]xclusive deal," and a quick and efficient means to take advantage of that deal. What the deal was, and whether it included the Terms of Use, remained in obscurity. The website asked for little—just an email address, a name, and payment information. And it provided the user the opportunity to "Continue," "Continue," "Continue," then "Redeem now." A reasonable user could infer she "enrolled" in something—a membership, a subscription, an agreement to purchase credits—but the contours of that enrollment are vague, and

22          CHABOLLA V. CLASSPASS, INC.

what the user manifests by enrolling is ambiguous at best. In fact, the website advertises "[n]o commitments." It is ironic that ClassPass now argues Chabolla unambiguously manifested her commitment to an arbitration clause. Viewed in total, we do not think a reasonably prudent internet user unambiguously manifests assent to the Terms of Use by working her way through ClassPass's multi-page website.

## IV. CONCLUSION

Neither the landing page nor screen 1 provided Chabolla with reasonably conspicuous notice of the Terms of Use. Even if screens 2 and 3 did, at no point did Chabolla unambiguously manifest her assent to the Terms of Use on those screens. Nor did Chabolla's use of the website, viewed in total, amount to her unambiguous manifestation of assent to the Terms of Use. Chabolla did not agree to be bound to the arbitration clause within those Terms of Use, so she eludes the Gordian knot that Ross Geller and Chandler Bing struggled against. We **AFFIRM** the district court's order denying ClassPass's motion to compel arbitration.

BYBEE, Circuit Judge, dissenting:

Katherine Chabolla signed up for a trial subscription with ClassPass for online fitness classes. She entered her name and credit card number, including the expiration date and three-digit CVC number. By the time she had entered her credit card information, Chabolla had navigated three screens, each of which informed her that by continuing and enrolling with ClassPass, she was agreeing to its Terms of Use. Three times Chabolla clicked an action button that was just above or just below the Terms of Use provision. In

return for her $39 initial payment, Chabolla knew she would receive six to nine classes each month and that the membership would automatically renew at $79 monthly until she cancelled it. When Chabolla realized she was being charged for classes she no longer wanted, she sued to void her membership and reclaim the money ClassPass charged her credit card. ClassPass sought to enforce an arbitration clause contained in its Terms of Use. *See AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) ("[C]ourts must place arbitration agreements on an equal footing with other contracts . . . and enforce them according to their terms . . . .") (internal citations omitted).

This case asks a simple question: did Chabolla agree to ClassPass's Terms of Use after seeing a hyperlink to those Terms of Use on three separate screens, agreeing to continue, and registering for ClassPass? The majority answers "no," on the grounds that Chabolla did not "unambiguously manifest her assent to the Terms of Use." Maj. Op. at 22. That decision is inconsistent with the test we recognized in *Berman v. Freedom Financial Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022) (applying California law), and our decisions applying *Berman* in *Patrick v. Running Warehouse, LLC*, 93 F.4th 468 (9th Cir. 2024), and *Oberstein v. Live Nation Entertainment, Inc.,* 60 F.4th 505 (9th Cir. 2023). Because the majority opinion will force internet services to alter their practices, contrary to what we have previously, and explicitly, approved, I respectfully dissent.

I

"In California, internet contracts are classified 'by the way in which the user purportedly gives their assent to be bound by the associated terms: browsewraps, clickwraps,

scrollwraps, and sign-in wraps.'" *Keebaugh v. Warner Bros. Ent. Co.*, 100 F.4th 1005, 1014 (9th Cir. 2024) (quoting *Sellers v. JustAnswer LLC*, 289 Cal. Rptr. 3d 1, 15 (Cal. Ct. App. 2021)). The California Court of Appeal has explained these terms:

> A "*browsewrap*" agreement is one in which an internet user accepts a website's terms of use merely by browsing the site. A "*clickwrap*" agreement is one in which an internet user accepts a website's terms of use by clicking an 'I agree' or 'I accept' button, with a link to the agreement readily available. A "*scrollwrap*" agreement is like a "clickwrap," but the user is presented with the agreement and must physically scroll to the bottom of it to find the "I agree" or "I accept" button. "*Sign-in wrap*" agreements are those in which a user signs up to use an internet product or service, and the sign-up screen states that acceptance of a separate agreement is required before the user can access the service. While a link to the separate agreement is provided, users are not required to indicate that they have read the agreement's terms before signing up.

*Sellers*, 289 Cal. Rptr. 3d at 15 (internal citations omitted). "To ensure that an online agreement passes muster, clickwrap is the safest choice," *Oberstein*, 60 F.4th at 517, although "the strongest notice is the scrollwrap agreement," *Keebaugh*, 100 F.4th at 1014. But, for better or worse, we have held that clickwraps and scrollwraps are not the only permissible choices for a website. We have approved

websites which bind users to Terms of Use through a
"hybrid" type of wrap—something more than a
"browsewrap" but less than a "clickwrap." *Oberstein*, 60
F.4th at 516–17. Applying a two-part test we identified in
*Berman*, we have held that "[u]nder California law a sign-in
wrap agreement may be enforceable based on inquiry
notice," so long as a "reasonably prudent Internet user"
(1) has "reasonably conspicuous notice" of the Terms of
Use, and (2) unambiguously manifests assent to the Terms
of Use. *Keebaugh*, 100 F.4th at 1014 (citing *Berman*, 30
F.4th at 856). Since *Berman*, we have upheld these "hybrid
wraps" repeatedly. *See*, *e.g.*, *Keebaugh*, 100 F.4th at 1014
(approving "a sign-in wrap agreement"); *Patrick*, 93 F.4th at
477 (approving a browsewrap agreement); *Oberstein*, 60
F.4th at 516–17 (approving a "hybrid form of agreement"
without identifying it precisely); *see also Domer v. Menard,
Inc.*, 116 F.4th 686, 694–95, 699–700 (7th Cir. 2024)
(relying on our *Berman* test and approving an "online
agreement [that] fall[s] somewhere in between" browsewrap
and clickwrap).

## II

This case should present a straightforward application of
*Berman* and its progeny. ClassPass provided conspicuous
notice of its Terms of Use on three separate occasions, and
Chabolla unambiguously manifested her assent to those
conditions at multiple points in the registration process by
clicking either "Continue" or "Redeem now." This was a
sign-in wrap agreement similar to others we have approved.
Maj. Op. at 10–11; *see Keebaugh*, 100 F.4th at 1014.
Nonetheless, the majority holds that ClassPass's sign-in
wrap fails the *Berman* test and therefore failed to bind Ms.
Chabolla to its Terms of Use, including the arbitration and
class action provisions therein. The majority reaches its

result by selectively parsing the webpages at issue here and ignoring our recent applications of the *Berman* test.

I turn now to the two *Berman* prongs.

A. *Reasonably conspicuous notice*

To be reasonably conspicuous, the notice must be "displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it." *Berman*, 30 F.4th at 856 (internal citations omitted). Disclosing Terms of Use through a hyperlink is sufficient, but "the fact that a hyperlink is present must be readily apparent." *Id.* at 857. "Simply underscoring words or phrases" is not enough. *Id.* Consumers should not have to "ferret out hyperlinks," *id.*, and the notice should not be "tucked away in obscure corners of the website," *Nguyen v. Barnes & Noble Inc*, 763 F.3d 1171, 1177 (9th Cir. 2014).

In general, "the conspicuousness and placement of the 'Terms of Use' hyperlink, other notices given to users of the terms of use, and the website's general design all contribute to whether a reasonably prudent user would have inquiry notice of a browsewrap agreement." *Id.* A "full registration process" may show "the contemplation of some sort of continuing relationship that . . . put[s] users on notice for a link to the terms of that continuing relationship." *Oberstein*, 60 F.4th at 517 (internal quotations omitted).

With these rules in mind, the notices in *Berman* and our more recent cases are helpful comparators. In *Berman*, we deemed the notice insufficient. It was "the antithesis of conspicuous." 30 F.4th at 856. The relevant text was "printed in a tiny gray font considerably smaller than the font used in the surrounding website elements, and indeed in a font so small that it [wa]s barely legible to the naked eye."

*Id.* at 856–57. The phrase "Terms & Conditions" was underlined but appeared in the same gray font. *Id.* at 856–57, 859. The pictures and text elsewhere on the page "direct[ed] the user's attention everywhere else."[1]   *Id.* at 857.



By contrast, in *Oberstein*, Ticketmaster presented users, at "three independent stages—when creating an account, signing into an account, and completing a purchase— ... with a confirmation button above which text inform[ed] [them] that, by clicking on this button, 'you agree to our Terms of Use.'" 60 F.4th at 515. For example, users who already had an account would see this text directly above the "Sign in" button and then again when they finalized their order and clicked "Place Order." *Id.* at 515–16. The phrase "Terms of Use" was in "bright blue font," distinguishing it from the gray text of the rest of the notice. *Id.* at 516. As the screenshots from *Oberstein* show, the sentence that

---

[1] I have provided screenshots of relevant webpages when appropriate. *See Berman*, 30 F.4th at 859 (Appendix A).

included the Terms of Use was readable, but it was also the smallest-sized text on the page.[2]



---

[2] *See Oberstein v. Live Nation Ent., Inc.*, No. CV 20-3888, 2021 WL 4772885, at \*2 (C.D. Cal. Sept. 20, 2021); Answering Brief for Defendants-Appellees, No. 21-56200, at 9.



We found the *Oberstein* notice reasonably conspicuous for three reasons: (1) the Terms of Use "were not buried on the bottom of the webpage or placed outside the action box, but rather were located directly on top of or below the action

button,"[3] (2) the blue hyperlink distinguished the Terms
from the rest of the text, and (3) "the context of this
transaction, requiring a full registration process, reflected the
contemplation of 'some sort of continuing relationship' that
would have put [reasonably prudent Internet] users on notice
for a link to the terms of that continuing relationship." *Id.* at
516–17 (quoting *Sellers*, 289 Cal. Rptr. 3d at 29).

Most recently, in *Patrick v. Running Warehouse, LLC*,
we found a single screen sufficiently conspicuous. 93 F.4th
at 477.  The phrase "Terms of Use" appeared "on an
uncluttered page," directly below the "Place Order" button.
*Id.* It was "not hidden or obscured" but instead was "clear
and legible," in "bright green—contrasted against the
surrounding white background and adjacent black text." *Id.*
That the phrase "Terms of Use" was the same color as other
links on the page "suggest[ed] clearly" that it was a
hyperlink, even though the links were "not blue, underlined,
or capitalized."[4] *Id.*

---

[3] An "action box" is the space on the webpage where the user enters
personal information and the "action button" is what the user must click
on to continue to the next screen or conclude the transaction.

[4] Mem. at 13, *Patrick v. Running Warehouse*, No. 2:21-cv-9978 (C.D.
Cal. Apr. 7, 2022) (Dkt. 49).

**Desktop Version of Running Warehouse Website**



**Mobile Version of Running Warehouse Website**

| | |
|---|---|
| Sales Tax: | $1.57 |
| Shipping: | $0.00 |
| **TOTAL:** | **$18.52** |

Place Order

By submitting your order you confirm you are 18 years of age or older and agree to our privacy policy and terms of use.

Edit Your Order

With these cases in mind, I turn to the screens at issue here. In order to sign up with ClassPass, Chabolla had to move through three screens that referred to the Terms of Use. She could not bypass any screen; in order to proceed from Screen #1 to Screen #2 or from Screen #2 to Screen #3, Chabolla had to click an action button, as she did to complete her order on Screen #3.

1.  Screen #1

The left-side of Screen #1[5] has large text and bullet-point explanations of the offer Chabolla was signing up for, along with multiple photos of fitness activities. The screen is relatively unencumbered—it has just 107 words in various fonts and sizes; 18 of those words are the sentence with the reference to the Terms of Use. On the right side, there is an action box with two action buttons inside. The user must either enter her email and then click the "Continue" button, or simply click the blue "Sign up with Facebook" button to move forward with the registration process. Below both of those buttons—but still inside the action box—it says, "By clicking 'Sign up with Facebook' or 'Continue,' I agree to the Terms of Use and Privacy Policy." This sentence is in a smaller, gray font, and the phrases "Terms of Use" and "Privacy Policy," are hyperlinked and in blue. *See Berman*, 30 F.4th at 854 (noting blue is the typical color that denotes a hyperlink).

---

[5] The screenshots provided by the parties show slightly lower prices ($35 initially and $75 per month thereafter) than Chabolla signed up for ($39 initially and $79 thereafter). The parties agree that the screens are otherwise substantially the same as the ones she saw.




Screen #1 is less cluttered than the one we found deficient in *Berman*. The action box is delineated and lacks extraneous information. It asks for an email (or to sign up with Facebook) and includes the Terms of Use proviso. The font is smaller than other text on the page, but easily readable, unlike in *Berman*. *Id.* at 856–57, 859 (screenshot showing "barely legible" font size).

The notice on Screen #1 is at least as obvious as the one we found to be conspicuous in *Patrick*. In *Patrick*, the screen had a hyperlink to the Terms of Use in a smaller, yet still legible font size, but it was green instead of blue. *Patrick*, 93 F.4th at 477. Just as in *Patrick*, the sentence mentioning ClassPass's Terms of Use is below the action button, and the screen has a white background. *Id.* Admittedly, the ClassPass page has a bit more clutter, but it is set off to the left side of the screen. The additional "Sign up with

34          CHABOLLA v. CLASSPASS, INC.

Facebook" box also detracts from the conspicuousness, but
a reasonably prudent Internet user would see the Terms of
Use sentence that is inside the action box and directly below
that button.

The notice we approved in *Oberstein* is also similar to
Screen #1. Its initial "Sign Up" or "Sign In" screen each had
the Terms of Use hyperlinked in blue in a smaller but still
legible blue font, set against a white background in the action
box. *Oberstein*, 60 F.4th at 516–17. *Oberstein* is only a bit
less cluttered than the ClassPass website, which includes
photographs and additional text outside the action box. *Id.*

In sum, Screen #1 alone is as conspicuous as the notices
deemed acceptable in *Oberstein* and *Patrick*. The majority
goes to great lengths to find otherwise. Maj. Op. at 16–17.
On this point, a screenshot is worth a thousand words—the
notices in *Berman*, *Oberstein*, and *Patrick*, as well as Screen
#1, are above. Screen #1 is much closer to *Oberstein* and
*Patrick* than *Berman*.

A reasonably prudent Internet user would have seen the
Terms of Use at this point.[6]  And unlike *Patrick* or *Berman*,
this screen is just the first of three that Chabolla saw.

---

[6] The majority concludes that Screen #1 is lacking because of the Terms
of Use disclaimer's "distance from relevant action items." Maj. Op. at
17. To the majority, this notice, placed just centimeters away from the
action buttons, is "on the periphery of where a user intending to use their
email would be looking" and "seems to fade into the irrelevancy of other
aspects of the page." Maj. Op. at 16. But the notice is in the action box,
in bright blue font, and is directly below the sign-up buttons. In deeming
Screen #1 unacceptable, the majority decides that a "reasonably prudent
Internet user," someone who in the 2020s sees "Terms of Use" policies
everywhere she looks on the Internet, would just breeze past this notice.

2.  Screen #2

Even if Screen #1 somehow failed to provide Chabolla with reasonably conspicuous notice of the Terms, she saw two more screens, each of which independently provided sufficient notice. Screen #2 is the most conspicuous of the three screens. It has the same basic format as Screen #1—the left side is identical to that Screen, and the right side has an action box. Screen #2 has only 98 words total on the page and 13 comprise the sentence warning that by continuing the user is agreeing to the Terms of Use. The action box requires the user to enter her first and last name. This time though, the Terms of Use proviso, which reads "By signing up you agree to our Terms of Use and Privacy Policy," appears *directly above* the action button, which once again says "Continue." The font is the same legible size as Screen #1, and the text is once again gray except for "Terms of Use" and "Privacy Policy" which are hyperlinked in blue. There is nothing between the first and last name fields and the Terms of Use proviso, which means that anyone filling in the first and last name boxes and then hitting "Continue" had to pass through the sentence that hyperlinked the Terms of Use.

36          CHABOLLA v. CLASSPASS, INC.




Screen #2 is nearly identical to the "Sign Up" and "Sign In" screens from *Oberstein*. *See Oberstein*, 60 F.4th at 516–517. The notice is even more conspicuous than the screen in *Patrick* because it has blue, not green, hyperlinks and places the notice above the action button, not below. *See Patrick*, 93 F.4th at 477. A reasonably prudent Internet user would have seen the Terms of Use notice on her way to clicking "Continue."

3. Screen #3

In case Screen #1 and Screen #2—alone or in conjunction—were not enough to provide reasonably conspicuous notice of the Terms, Chabolla then moved to Screen #3. This screen is once again split left and right. On the left, the details of the offer are listed in larger font, the price is listed, and there are three paragraphs of text in small gray font. On the right side, there is an action box. This box

asks for standard billing information—name of card holder, card number, expiration date, CVC code, and zip code. Below that, the box includes small logos from various credit card companies, a clickable link regarding gift card redemption, and then in the same gray font as before, the following sentence: "I understand that my membership will automatically renew to the [$79] per month plan plus applicable tax until I cancel. I agree to the Terms of Use and Privacy Policy." Again, "Terms of Use" and "Privacy Policy" are hyperlinked in blue. These two sentences appear *directly above* the "Redeem Now" button that Chabolla clicked to complete the transaction.



This screen is similar to the purchase screen in *Oberstein*. There, after completing credit card and billing information, the user clicked "Place Order," but directly above it was a sentence in small but legible black font that

38          CHABOLLA V. CLASSPASS, INC.

said, "By continuing past this page and clicking 'Place Order,' you agree to our Terms of Use," with "Terms of Use" in blue. *Oberstein*, 60 F.4th at 515–16. And as with Screen #2, this screen on its own is as good or better than the one we approved in *Patrick*—the notice is more conspicuously placed (above the action button instead of below), and the hyperlink is in blue, not green. *Patrick*, 93 F.4th at 477.

\* \* \*

By the time Chabolla clicked "Redeem now" on Screen #3, ClassPass had placed the Terms of Use in the action box three different times. Each time the notice sat directly above or below the action button (not in some far-off corner of the webpage) in legible blue text. Moreover, the three screens, asking for Chabolla's email, name, and credit card information, show this was a "full registration process" that culminated in her being charged $39 on the date she registered, and agreeing to monthly payments in the future. *Oberstein*, 60 F.4th at 517. As even the majority acknowledges, Maj. Op. at 13, the ClassPass sign-up process "reflected the contemplation of some sort of continuing relationship that would have put [a reasonably prudent Internet user] on notice for a link to the terms of that continuing relationship." *Oberstein*, 60 F.4th at 517 (internal citations omitted); *see Sellers*, 289 Cal. Rptr. 3d at 26 (noting a "majority of the federal cases finding an enforceable sign-in wrap agreement involve continuing, forward-looking relationships").

I would hold that the ClassPass screens, considered individually or jointly, satisfied the "reasonably conspicuous notice" requirement. I am confused by the majority opinion on this prong. The majority questions whether ClassPass's Screen #1 satisfies the "reasonably conspicuous prong," and

then waffles as to whether Screens #2 or #3 individually (or
considered together) satisfy it. Maj. Op. at 16–18. Although
the majority admits there is "some indication of a continuing
relationship," Maj. Op. at 13, and that the transaction here is
"reflective of the one in *Oberstein*," which we found
acceptable, Maj. Op. at 13–14, the majority "decline[s] to
consider any further whether the notices on Screens #2 and
#3 are conspicuous enough," thus rendering its incomplete
discussion dicta.[7] Maj. Op. at 17. In my view, *Oberstein*
and *Patrick* are not so easily ignored. Those cases approved
notices that were less clear (and on fewer screens). Any one
of the screens Chabolla saw was enough to put a reasonably
prudent Internet user on notice of the Terms of Use, and all
three screens taken together, plus the continuing nature of
this transaction, is more than enough to satisfy *Berman*'s
first prong.

## B. *Unambiguous manifestation of assent*

The second *Berman* prong asks whether the user
"unambiguously manifested their assent to be bound by the
terms and conditions." *Berman*, 30 F.4th at 857. "A user's
click of a button can be construed as an unambiguous

---

[7] The majority's response to this point is even more confusing. The
majority states that "[e]ven if screens 2 and 3 provided notice of the
Terms of Use, Chabolla had no means of manifesting her assent to those
terms on those screens," and therefore any discussion of
conspicuousness as to these screens would be "non-dispositive and
fruitless." Maj. Op. at 17–18. I am left wondering if this means the
majority is conceding that the first *Berman* prong—reasonable notice—
is met, and the dispositive issue with the ClassPass screens is really the
second prong—whether Chabolla unambiguously manifested her assent
to those terms. If so, both the majority and I agree that the first *Berman*
prong has been satisfied. In Section II.B, below, I address the dispositive
issue, the second *Berman* prong.

manifestation of assent only if the user is explicitly advised
that the act of clicking will constitute assent to the terms and
conditions of the agreement." *Id.* (citing *Specht v. Netscape
Commc'ns Corp.*, 306 F.3d 17, 29–30 (2d Cir. 2002)).
That's because "merely clicking on a button on a webpage,
viewed in the abstract, does not signify a user's agreement
to anything." *Id.* "The presence of 'an explicit textual notice
that continued use will act as a manifestation of the user's
intent to be bound' is critical . . . ." *Id.* at 857–58 (quoting
*Nguyen*, 763 F.3d at 1177). This part of the *Berman* "test—
whether the user takes some action that unambiguously
manifests assent—is relatively straightforward." *Oberstein*,
60 F.4th at 515.

1. Screen #1

Here, Screen #1 does exactly what *Berman* says is
enough. It states that "By clicking 'Sign up with Facebook'
or 'Continue,' I agree to the Terms of Use and Privacy
Policy." The webpage in *Berman* failed this prong because,
although the notice said, "I understand and agree to the
<u>Terms and Conditions</u>," it "did not indicate to the user what
action would constitute assent" to those Terms. 30 F.4th at
858. But *Berman* provided e-commerce websites with a
solution. We said that a webpage with a "Continue" action
button and a notice that said, "By clicking the Continue >>
button, you agree to the <u>Terms and Conditions</u>" would work.
*Id.* (citing *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 78–80
(2d Cir. 2017) (finding an enforceable agreement when the
Uber mobile app explicitly warned, "By creating an Uber
account, you agree to the TERMS OF SERVICE &
PRIVACY POLICY")). Where "the notices at issue
explicitly alert the user that by creating an account, signing
in, or purchasing [the service] and proceeding to the next
page, the user 'agrees to our Terms of Use,'" *Berman*'s

second prong has been fully satisfied. *Oberstein*, 60 F.4th at
517; *see Patrick*, 93 F.4th at 477.

Nonetheless, Chabolla argues Screen #1 fails the second
*Berman* prong because its "context is non-contractual" since
it is placed at the first stage of the sign-up process. But
nothing in *Berman* requires that the manifestation of assent
occur at any particular stage of the enrollment process. In
*Berman*, the user entered her zip code on the screen that
attempted to notify users of the Terms of Use and then
continued to another screen where she provided "personal
information" to complete the enrollment process. *Berman*,
30 F.4th at 853–54. The *Berman* court's issue with the
notice was that it failed to "indicate to the user what action
would constitute assent to those terms and conditions." *Id.*
at 858. Screen #1 has no such flaw. *See Oberstein*, 60 F.4th
at 517 ("[Plaintiffs] do not contest that the notices at issue
explicitly alert the user that by creating an account, signing
in, or purchasing a ticket, and proceeding to the next page,
the user 'agrees to our Terms of Use.' As the *Berman* court
emphasized, that is all that is required.") (citing *Berman*, 30
F.4th at 858)). Screen #1 does exactly what *Berman* requires
and, therefore is sufficient on its own to meet *Berman*'s
second prong.

2. Screen #2

Screen #2 required Chabolla to input her first and last
name and said, "By signing up you agree to our Terms of
Use and Privacy Policy," along with a "Continue" action
button. Although the language could have been clearer—
"By signing up" does not correspond precisely with the
action required (clicking "Continue")—it provided Chabolla
with easy access to the Terms of Use as she continued with
the sign-up process. *See Berman*, 30 F.4th at 858; *see*

*Keebaugh*, 100 F.4th at 1021 n.6 (finding that even when the
Terms proviso said "By tapping 'Play' I accept the Terms of
Use . . ." and the Terms themselves were hyperlinked as
"Terms of Service," the user assented to those Terms
because, "[g]iven the prevalence of Terms of Use and Terms
of Service in modern society and the frequency they are
presented to users, it [wa]s clear from the context what was
meant by "Terms of Use"); *see also Lee v. DoNotPay, Inc.*,
683 F. Supp. 3d 1062, 1067, 1075 (C.D. Cal. 2023)
(concluding that a "language mismatch from the proximate
disclaimer"—the disclaimer said "By signing up or signing
in" and the action button said "Continue"—"did not
undermine assent"). Screen #2 also satisfies *Berman*'s
second prong.

3. Screen #3

Screen #3 required Chabolla to input her credit card
information and conclude the transaction. This screen is
undoubtedly contractual. It said, "I agree to the Terms of
Use and Privacy Policy," alongside an action button that
said, "Redeem Now." Chabolla argues this screen is
insufficient to satisfy *Berman* because it is not
"unambiguous" as to whether clicking "Redeem now"
would constitute assent to the Terms of Use. *See Berman*,
30 F.4th at 858. There is no merit to her argument.

ClassPass might have used different language than
"Redeem now," but in context it was clear what she was
doing when she clicked that button. By the time Chabolla
reached Screen #3, she knew the enrollment process was at
an end. She had given ClassPass her email, name, and credit
card information. There was nothing more for Chabolla to
do but sign up for the service and pay her initial fee. At this
point, one must ask what Chabolla (or any reasonably

prudent Internet user) would think is happening when she
clicks "Redeem now" after entering her credit card
information.  *Berman* does not require magic words or a
perfect match between the notice phrasing and the action
button text.  Instead, it requires that "the notice . . . explicitly
notify a user of the legal significance of the action she must
take to enter into a contractual agreement."[8]  *Id.*; *see Patrick*,
93 F.4th at 477 (finding unambiguous assent when the notice
said "By submitting your order . . . [you] agree to
our . . . terms of use," alongside an action button that stated,
"Place Order").[9]   When Chabolla completed Screen #3,

---

[8] The majority makes much of the fact that "Redeem now" is at the
bottom of the page and follows "Received a ClassPass gift card?" on
Screen #3. Maj. Op. at 20. The majority finds that this phrase "muddles
the meaning of 'Redeem now'" because a user may think "Redeem now"
means they are redeeming a gift card, rather than purchasing a
membership. Maj. Op. at 20. But in context, there is no ambiguity.
Screens #1 and #2 had bold typeface stating, "**Save $40** on your first
month" and had a separate blue box stating "$40 off first month." Screen
#3 made clear that the first month's charge was $39, and just above the
"Redeem now" button was the statement "I understand that my
membership will automatically renew to the [$79] per month plan plus
applicable tax until I cancel." "Redeem now," when read in the context
of all three screens—and unambiguously on Screen #3—was an
invitation to redeem the special offer.  The question "Received a
ClassPass gift card?" appeared just below icons of three major credit
cards and clarified that you could also sign up and pay for ClassPass
using a gift card.

[9] The majority summarizes our cases as requiring "the website t[ell] the
user what clicking a button meant," Maj. Op. at 21, and cites *Patrick* as
an example of doing just that, Maj. Op. at 20. We found the screen in
Patrick acceptable notwithstanding a mismatch between the action
button and disclaimer because, as the majority requires, it sufficiently
"told the user what clicking a button meant." So too here. Chabolla saw
three screens and manifested her assent to the Terms of Use by clicking

(44 of 50)

Case: 24-5981, 03/27/2025, DktEntry: 23.1, Page 44 of 55    Case 5:24-cv-01023-EJD Document 93, Filed 03/17/25, Page 47 of 53

44          CHABOLLA v. CLASSPASS, INC.

signed up for ClassPass, and agreed to be charged for the service, she unambiguously manifested assent to the Terms.

\* \* \*

The screens, considered individually, required Chabolla to manifest her assent to the Terms of Use. When we consider all three screens together, that conclusion is not only inevitable but overwhelming. Chabolla received three conspicuous notices of the Terms and unambiguously assented three times during the sign-up process. For any reasonably prudent Internet user, this was enough to bind her in contract.

### III

I respectfully disagree with the majority's conclusion. If this were just about Chabolla—if this were just a minor dispute about the vagaries of language—I might not be so concerned to put this all in writing. But I fear the effects of the majority's opinion extend far beyond this case. The majority's decision demonstrates that we will examine all internet contracts with the strictest scrutiny and that minor differences between websites will yield opposite results. A website such as ClassPass cannot rely on our decisions in *Patrick* and *Oberstein*, which approve nearly identical language. That sows great uncertainty in this area.

When companies structure their websites to respond to our opinions but can't predict how we are going to react from one case to another, we destabilize law and business. After

---

"Continue" twice and "Redeem Now" once. Just last year in *Patrick* we did not require an exact disclaimer/button match. The majority provides no explanation for why we should do so now, and in the process creates an intra-circuit split on what constitutes manifestation of assent under *Berman*.

today's decision, a website will have to guess whether any
nuance at all in its sign-in wrap will be held against it. The
result is one of *caveat websitus internetus* (roughly
translated as "internet websites beware!"). Our decision
today will drive websites to the only safe harbors available
to them, the clickwrap or scrollwrap agreements. As a policy
matter, that may be a perfectly acceptable landing place, but
it is not the landing place that we have approved in the past,
and we are neither the Congress nor the California State
Assembly.

Because I would hold that Chabolla agreed to
ClassPass's Terms of Use, I would reverse the judgment of
the district court and order the arbitration provision
enforced. I respectfully dissent.

APPENDIX



classpass

**You're invited to join ClassPass!**

**Try classes at top studios nearby**

Cycling, strength training, yoga — choose any class, anywhere, with one flexible membership.

Explore all studios



**No studio limits**

With ClassPass, there's no limit to how often you can visit studios. So whether you're trying out new spots every day or coming back to a favorite class all month long, you get to do you — always.

**The easiest way to book fitness classes**

Book classes anywhere with one monthly fee + no class packs required. Plus, one app, flexible plans and dynamic pricing make managing (and maximizing) your schedule easy.

**Save up to 70% off drop-in rates**

Sweat your workouts – not their prices. Save on every class (at gyms, fitness studios and more!) when you book through ClassPass.

A membership that's more than just fitness classes



Not ready to start today?

Get an inside look at the classes available in your neighborhood with our fitness city guide.

Email address    City name    Get your guide

# You're invited to join ClassPass!

Save $40 on your first month, plus your friend gets $40 when you join.

> Get access to top studio and wellness venues
> Save over 70% off drop in rates
> You're never locked in. Cancel anytime



## Exclusive deal for friends of ClassPass

$40 OFF FIRST MONTH

**Enter your email to continue**

Email address

Continue

— or —

Sign up with Facebook

By clicking 'Sign up with Facebook' or 'Continue,' I agree to the Terms of Use and Privacy Policy.

After first month, you'll auto-enroll in our $75/month plan. Change or cancel any time during your trial to not be charged.

I'm in **San Francisco**



classpass

# You're invited to join ClassPass!

Save $40 on your first month, plus your friend gets $40 when you join.

> Get access to top studio and wellness venues

> Save over 70% off drop in rates

> You're never locked in. Cancel anytime



## Exclusive deal for friends of ClassPass

**$40 OFF FIRST MONTH**

### What's your name?

First name

Last name

By signing up you agree to our Terms of Use and Privacy Policy.

Continue

After first month, you'll auto-enroll in our $75/month plan. Change or cancel any time during your trial to not be charged.

I'm in **San Francisco**



sspass

classpass

Step 2 of 2

**INCLUDED IN YOUR OFFER**

🔲 1 month (and 45 credits) to book any classes you want.

☑ With 45 credits, you can book 6 – 9 classes. The average class in San Francisco is 6 credits.

🔄 No commitments. Cancel anytime.

| 45-Credit Plan | $35.00 + Tax |
|---|---|
| **Due today** | **$35.00** |

By purchasing through your friend's invitation, you are receiving a one-time discount of up to $40.00 off your first month. Adjusted price reflected below. Cannot be combined with other offers.

After first month, account will autorenew to the 45-credit plan membership monthly rate of $75 unless canceled before the end of trial period.

Gift can be applied towards monthly subscription rates only and not to other fees, such as late cancellation/missed class fees you incur or optional add-on classes/packs. Gifts recipient is responsible for the difference if gift is less than monthly fee and for applicable taxes. I agree to the ClassPass <a target="_blank" href="https://ccln8.classpass.com/dist/classpass_gift_terms.pdf">Gift Terms</a>

### Your saved billing information

Why do you need my credit card info?

Name on card

Jane Smith

Card number

• • • • • • • • • • 4242

Exp date          CVC

2 / 22          • • •

Postal code

11101

Powered by **stripe**   **VISA**   🔴🟠   **AMEX**

Received a ClassPass gift card?

I understand that my membership will automatically renew to the $75 per month plan plus applicable tax until I cancel. I agree to the Terms of Use and Privacy Policy.

**Redeem now**